CAPITAL FITNESS OF ARLINGTON HEIGHTS, INC., d/b/a Powerhouse Gym, Plaintiff-Appellant, v. THE VILLAGE OF ARLINGTON HEIGHTS, Defendant-Appellee.

First District (4th Division)    No. 1—07—0559

Opinion filed September 17, 2009.

Jack B. Teplitz & Associates, of Chicago (Jack B. Teplitz, of counsel), for appellant.

Holland & Knight LLP, of Chicago (Jack M. Siegel and Iain D. Johnston, of counsel), for appellee.

JUSTICE NEVILLE delivered the opinion of the court:

The plaintiff, Capital Fitness of Arlington Heights (Capital Fitness), filed a second amended complaint and sought a declaration that the defendant, the Village of Arlington Heights (the Village), improperly adopted a tax increment financing (TIF) district for an area that included Capital Fitness's commercial leasing space. Following a bench trial, the trial court found that Capital Fitness failed to show by clear and convincing evidence that the Village abused its discretion when it designated the area as a TIF district; therefore, it denied Capital Fitness's request for declaratory judgment. Capital Fitness now appeals and presents the following issues for our review: (1) whether the Village properly complied with the requirements of the Tax Increment Allocation Redevelopment Act (TIF Act) (65 ILCS 5/11—74.4—1 *et seq.* (West 2002)) when it established the ordinance that created the TIF district; (2) whether Capital Fitness overcame the presumption of validity of the Village's TIF ordinance with clear and convincing evidence; and (3) whether the trial court's decision was against the manifest weight of the evidence. For the following reasons, we affirm the trial court's denial of Capital Fitness's request for a declaratory judgment.

## BACKGROUND

The record reveals that in 1997, Capital Fitness signed an 11-year commercial lease with Arlin-Golf, the owner of the International Plaza shopping center located at 120-388 East Golf Road in Arlington Heights. Pursuant to the lease, Capital Fitness leased approximately

15,019 square feet of space for the purpose of operating a fitness center.

In 2001, the Village began investigating whether to redevelop a 35-acre portion of land, commonly referred to as the redevelopment project area,[1] in the southern part of Arlington Heights. The redevelopment project area consisted of both improved and vacant parcels of land. The improved property consisted of International Plaza,[2] a Japanese restaurant, Arlin-Golf Plaza, an abandoned gas station, and single-family residential property. William Enright, the Village's deputy director of planning and community development, and his staff determined that the area qualified for redevelopment under the TIF Act. The Village then retained Kane, McKenna & Associates, a consultant firm that specialized in tax increment financing.

In January and February 2002, the Village's staff and representatives of Kane, McKenna & Associates evaluated the redevelopment project area. In February 2002, the Village and Kane, McKenna & Associates jointly prepared the Village of Arlington Heights Road/Golf Road redevelopment plan and project No. 4 report. The report concluded that the redevelopment project area consisted of residential single-family homes, retail and commercial properties, and unimproved properties. The report also concluded that the improved portion of the redevelopment project area was blighted because it suffered from obsolescence, deterioration, excessive vacancies, inadequate utilities, deleterious layout, lack of community planning, and lag in the equalized assessed valuation growth. Finally, the report also concluded that the vacant portions of the redevelopment project area suffered from obsolete platting of land, lag in the equalized assessed value of the proposed redevelopment project area, and chronic flooding.

On March 27, 2002, the Joint Review Board of Arlington Heights held a public hearing on the instant matter. On April 24, 2002, the Arlington Heights Redevelopment Commission held a hearing on the matter. The Joint Review Board and the Redevelopment Commission recommended adoption of the redevelopment plan. On July 1, 2002, the Village board of trustees adopted three ordinances: (1) ordinance No. 02—049 (Village of Arlington Heights Ordinance No. 02—049 (eff. July 1, 2002)) approving the redevelopment plan; (2) ordinance No.

---

[1] The TIF Act defines "redevelopment project area" as "an area designated by the municipality *** to which the municipality has made a finding that there exist conditions which cause the area to be classified as *** a blighted area." 65 ILCS 5/11—74.4—3(p) (West 2002).

[2] According to Capital Fitness, International Plaza comprised 70% of the improved area.

02—050 (Village of Arlington Heights Ordinance No. 02—050 (eff. July 1, 2002)) approving TIF area No. 4; and (3) ordinance No. 02—051 (Village of Arlington Heights Ordinance No. 02—051 (eff. July 1, 2002)) adopting tax increment financing pursuant to the TIF Act for TIF area No. 4.

In June 2003, Capital Fitness hired Rolf Campbell & Associates, a city planning firm, to review the redevelopment plan adopted by the Village. Rolf Campbell & Associates concluded that the area did not qualify for tax increment financing. Capital Fitness also hired Strategic Planning Associates to evaluate the Kane, McKenna & Associates study, and Strategic Planning Associates disagreed with many of the findings made by Kane, McKenna & Associates.

On July 23, 2002, Capital Fitness filed a verified complaint for declaratory and injunctive relief and requested the following relief: (1) an order enjoining the Village from using its power to condemn property under the TIF Act; (2) a declaration that the property is not blighted; (3) a declaration that the International Plaza shopping center should not be included in the designated area; and (4) damages for the loss of the use of its property. On September 27, 2002, the Village filed a section 2—615 motion to dismiss Capital Fitness's complaint. On August 14, 2003, the trial court entered an order dismissing the complaint but granting Capital Fitness 28 days to file an amended complaint.

On August 20, 2003, Capital Fitness filed a first amended complaint requesting declaratory and injunctive relief. Count I sought injunctive relief in the form of an order enjoining the Village from (a) implementing and enforcing the ordinances, (b) selling bonds or undertaking any obligations or making any expenditures pursuant to the ordinances, or (c) entering into any agreements to purchase or cause the development of any property in the redevelopment project area. Count II sought a declaration that the ordinances were void because the redevelopment plan did not meet the requirements of the TIF Act.

On September 22, 2003, the Village filed a motion pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2002)) to dismiss the first amended complaint. On September 26, 2003, Capital Fitness filed a motion for partial summary judgment and argued that ordinance No. 02—049 adopting the tax increment redevelopment plan and project No. 4 was invalid because the Village's finding that the redevelopment plan conformed to the Village's comprehensive plan was erroneous.

On January 14, 2004, the trial court entered an order and granted the Village's motion to dismiss count I (injunctive relief) but denied

the motion to dismiss count II (declaratory judgment). The order also denied Capital Fitness's motion for partial summary judgment.

On September 25, 2006, Capital Fitness filed a second amended verified complaint for declaratory relief. Capital Fitness requested that the trial court declare (1) that the redevelopment project area was not blighted; (2) that the Village failed to demonstrate that the redevelopment project area was not subject to growth and development through investment by private enterprise and could not be reasonably anticipated to be developed without adoption of the redevelopment plan; and (3) that the Village board erroneously found that the redevelopment plan conformed to the Village's comprehensive plan.

The trial court held a trial and the following people testified: (1) Enright, the Village's director of planning; (2) Patrick O'Connor, an in-house attorney for Foster Bank; (3) Evan Rayman, the vice president of Capital Fitness; (4) Dan Whalen, an employee of a commercial asphalt paving business; (5) James Massarelli, the director of engineering for the Village; (6) Arlene Mulder, the president of the Village; (7) Carol Blackwood, a member of the planning commission of the Village; (8) Su-Chuan Hsu, the president and manager of Arlin-Golf; (9) Jeremiah Yeksavich, a senior urban planner with Rolf Campbell & Associates; (10) Al Maiden, an urban planner with Rolf Campbell & Associates; (11) Steven Hovany, an urban planner and consultant for Strategy Planning Associates, Inc.; (12) Joseph Farwell, a trustee of the Village; (13) Philip McKenna, the president of Kane, McKenna & Associates; and (14) Robert Rylicki, a financial adviser for Kane, McKenna & Associates. At the conclusion of the trial, Capital Fitness and the Village submitted proposed findings of fact and posttrial briefs. On January 26, 2007, the trial court entered an order and denied Capital Fitness's request for a declaratory judgment.

## ANALYSIS

### I. Standard of Review

■ Illinois case law is clear that when a Village approves the findings of blight in a village ordinance, a presumption exists that the Village's findings of blight were valid. *Geisler v. City of Wood River*, 383 Ill. App. 3d 828, 850 (2008), citing *Board of Education, Pleasantdale School District No. 107 v. Village of Burr Ridge*, 341 Ill. App. 3d 1004, 1012 (2003). Therefore, it was Capital Fitness's burden to overcome, by clear and convincing evidence, the presumption that the Village's findings of blight were valid. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U v. City of Wilmington*, 253 Ill. App. 3d 503, 508 (1993). An appellate court will not set aside a trial court's finding that the plaintiff failed to meet its

burden unless it is contrary to the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

## II. The TIF Act

■ The TIF Act (65 ILCS 5/11—74.4 *et seq.* (West 2002)) became effective in Illinois on January 10, 1977. See *Board of Education, Pleasantdale School District No. 107 v. Village of Burr Ridge*, 341 Ill. App. 3d 1004, 1010 (2003), citing *People ex rel. City of Canton v. Crouch*, 79 Ill. 2d 356, 360 (1980). The purpose of the TIF Act is to "provide municipalities with the means to eradicate blighted conditions by developing or redeveloping areas so as to prevent the further deterioration of the tax bases of these areas and to remove the threat to the health, safety, morals, and welfare of the public that blighted conditions present." *Board of Education, Pleasantdale School District No. 107*, 341 Ill. App. 3d at 1010, citing 65 ILCS 5/11—74.4—2(a), (b), (c) (West 1994); *People ex rel. City of Canton*, 79 Ill. 2d at 360; *Castel Properties, Ltd. v. City of Marion*, 259 Ill. App. 3d 432, 433-34 (1994); *Board of Education of Community High School District No. 218 v. Village of Robbins*, 327 Ill. App. 3d 599, 601-02 (2001). The TIF Act enables a municipality to eliminate blighted conditions by collecting real property tax increment revenues from local taxing districts within the TIF district and diverting the revenues to fund TIF development projects. *Board of Education, Pleasantdale School District No. 107*, 341 Ill. App. 3d at 1010-11, citing 65 ILCS 5/11—74.4—2(a), (c), 11—74.4—3(t) (West 1994); *People ex rel. City of Canton*, 79 Ill. 2d at 369; *Henry County Board v. Village of Orion*, 278 Ill. App. 3d 1058, 1060 (1996).

■ To be eligible for tax increment financing, a municipality must first establish that the proposed redevelopment project area is a "blighted" area. 65 ILCS 5/11—74.4—3(a) (West 2002). In order for improved land to be considered blighted, the area must be detrimental to the public safety, health, or welfare and suffer from five or more of the following blighting factors: (1) dilapidation, (2) obsolescence, (3) deterioration, (4) presence of structures below minimum code standards, (5) illegal use of individual structures, (6) excessive vacancies, (7) lack of ventilation, light, or sanitary facilities, (8) inadequate utilities, (9) excessive land coverage and overcrowding of structures and community facilities, (10) deleterious land use or layout, (11) environmental cleanup, (12) lack of community planning, and (13) the total equalized assessed value of the proposed redevelopment project area has declined for three of the last five calendar years prior to the year in which the redevelopment project area is designated. 65 ILCS 5/11—74.4—3(a)(1) (West 2002).

■ In order for vacant land to be considered blighted, the sound growth of the redevelopment project area must be impaired by a combination of two or more of the following blighting factors: (1) obsolete platting, (2) diversity of ownership of parcels, (3) tax and special assessment delinquencies, (4) deterioration, (5) hazardous waste cleanup, and (6) lag in the equalized assessed value of the proposed redevelopment project area. 65 ILCS 5/11—74.4—3(a)(2) (West 2002).

Alternatively, vacant land may also be considered blighted if any one of the following blighting factors exists: (1) the area consists of one or more unused quarries, mines, or strip mine pods; (2) the area consists of unused rail yards, rail tracks, or railroad rights-of-way; (3) the area is subject to chronic flooding; (4) the area consists of unused or illegal disposal sites; (5) the land is designated as a town or village center; or (6) the area qualified as a blighted improved area immediately prior to becoming vacant. 65 ILCS 5/11—74.4—3(a)(3) (West 2002).

Each of the blighting factors found to be in existence must be (1) present to a meaningful extent so that a municipality may reasonably find that the factor is clearly present within the intent of the Act, and (2) reasonably distributed throughout the improved part of the redevelopment project area. 65 ILCS 5/11—74.4—3(a)(1), (a)(2), (a)(3) (West 2002).

■ The TIF Act also provides that no redevelopment plan shall be adopted unless a municipality finds that the redevelopment project area has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan. 65 ILCS 5/11—74.4—3(n)(J)(1) (West 2002). This is commonly referred to as the "but for" test. See, *e.g.*, *Board of Education, Pleasantdale School District No. 107*, 341 Ill. App. 3d at 1019.

In addition, no redevelopment plan shall be adopted unless a municipality finds that the redevelopment plan and project conform to the comprehensive plan for the development of the municipality as a whole. 65 ILCS 5/11—74.4—3(n)(J)(2) (West 2002).

### III. Blighting Factors Relevant to the Improved Area

The Village found that the following blighting factors existed with respect to the improved areas of the redevelopment project area: (1) obsolescence, (2) deterioration, (3) excessive vacancies, (4) inadequate utilities, (5) deleterious land use or layout, (6) lack of community planning, and (7) lag in the equalized assessed value of the proposed redevelopment project area. See 65 ILCS 5/11—74.4—3(a)(1) (West

2002). Although the Village found that seven of the factors existed, the Village only needed to find that five of the factors existed in order for the area to be designated blighted. See 65 ILCS 5/11—74.4—3(a)(1) (West 2002). The trial court found that, for all of the factors except inadequate utilities, Capital Fitness failed to establish by clear and convincing evidence that the Village's findings of blight were against the manifest weight of the evidence.

## A. Obsolescence

In order to determine whether the trial court's findings were against the manifest weight of the evidence, we must review the evidence presented during the trial. The TIF Act defines "obsolescence" as "[t]he condition or process of falling into disuse. Structures have become ill-suited for the original use." 65 ILCS 5/11—74.4—3(a)(1)(B) (West 2002). The TIF report indicated: (1) that 50% of the parcels were either functionally or economically obsolete; (2) that International Plaza was an outdated shopping center with chronic vacancies, a poor U-shape layout, and no strong anchor tenants[3]; (3) that the equalized assessed value of the proposed redevelopment project area dropped 45% since 1994 due to vacancies and obsolescence, (4) that the commercial- and business-zoned properties surrounded single-family residences; (5) that the platting is obsolete in relation to current uses; and (6) that the single-family residences were not adequately buffered from the commercial properties.

Enright testified that he was familiar with the area in question, that he had walked around the site, and that he had reviewed aerial photographs and plat maps of the site. He further testified that International Plaza was underutilized because the U-shape of the shopping center was outdated and did not meet contemporary standards for successful shopping, the bottom of the U-shape was back nearly 800 feet from the road, there was no anchor tenant to attract customers, and it did not have access to two major roads like most other contemporary shopping centers. Similarly, the Arlin-Golf Plaza had poor access into and out of the shopping center, poor visibility of the store fronts from the major roads, and a parking lot that was in disrepair. Enright further testified that the gas station was deteriorated and had been vacant for a number of years.

---

[3]The trial court found that an anchor tenant is a retailer that occupies between 25,000 to 175,000 square feet of a shopping center and draws large numbers of customers into the center. An anchor tenant adds to the vitality of a complex because customers that patronize the anchor tenant are likely to patronize other smaller businesses in the same center.

McKenna testified that he visited and observed the site. He testified that a gas station was vacant, that International Plaza could not maintain tenant occupancy, and that Arlin-Golf Plaza was not built to current commercial standards and would have difficulty attracting tenants in the current marketplace.

Rychlicki testified that there was inadequate buffering between the commercial and residential areas. He also testified that the rental rates were less than the rental rates of surrounding areas.

The November 17, 1998, appraisal report,[4] prepared at Hsu's request, indicated that the International Plaza building suffered from "an increment of functional obsolescence" because (1) the building was a U-shape and most centers are L-shaped for ideal tenant visibility and parking/traffic flow; (2) the building only has one loading facility accessible to a single tenant; (3) there is no anchor tenant, or tenant space large enough to carry an anchor tenant, resulting in no significant customer draw to the center; and (4) in 1997 and 1998, the owners of the shopping center offered rent abatements and gross rental rates to attract tenants and increase the property's occupancy. The appraisal report also indicated that the International Plaza building suffered from external obsolescence because (1) retail properties are in great supply and will continue to be as new, more modern centers are constructed, and (2) the average vacancy for Chicago businesses in 1997 was 10%, but International Plaza had a 28% vacancy rate according to the January 1, 1998, rent roll. Accordingly, the November 17, 1998, report concluded that the "highest and best use is to demolish the existing improvement and construct a new facility, financially feasible retail establishment recognizing the current zoning." We note that the November 16, 2001, appraisal report for Hsu contained the same conclusions.

We find, based on the above evidence presented during the trial, that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it found that the improved areas of the redevelopment project area suffered from obsolescence. Therefore, after reviewing the record, we hold that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

---

[4]As noted by Capital Fitness in its reply brief, the trial court admitted the appraisals not for the truth of the matter asserted, but for the fact that they contained information that could be relied upon by experts. Enright testified that he reviewed and relied upon the appraisal report.

## B. Deterioration

The TIF Act defines "deterioration" as (1) with regard to buildings, major defects in the secondary building components such as doors, windows, porches, gutters and down spouts, and fascia, and (2) with respect to surface improvements, that the condition of roadways, alleys, curbs, gutters, sidewalks, off-street parking, and surface storage areas evidence deterioration including surface cracking, crumbling, potholes, depressions, loose paving material, and weeds protruding through the paved surfaces. 65 ILCS 5/11—74.4—3(a)(1)(C) (West 2002).

In the instant case, the TIF report indicated that 30% of the parcels exhibited deterioration. Specifically, the report indicated that parking lots and driveways within the redevelopment project area were cracked, buckled, or had potholes. In addition, as indicated above, Enright and McKenna testified that the gas station was abandoned and the building had deteriorated. In fact, Capital Fitness concedes on appeal that the gas station was deteriorated.

We find, based upon the above evidence presented during the trial, that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it found that the improved areas of the redevelopment project area suffered from deterioration. Accordingly, we hold that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

## C. Excessive Vacancies

The TIF Act defines "excessive vacancies" as "[t]he presence of buildings that are unoccupied or under-utilized and that represent an adverse influence on the area because of the frequency, extent, or duration of the vacancies." 65 ILCS 5/11—74.4—3(a)(1)(F) (West 2002).

The TIF report indicated that Arlin-Golf Plaza suffered from vacancy rates of 29%, 29%, 59%, 59%, and 59% in the five years prior to the report. The TIF report also indicated that International Plaza suffered from vacancy rates of 11%, 26%, 25%, 25%, and 25% in the five years prior to the report.[5] Prior to the last five years, the vacancy rates were as high as 75%. Typical vacancy rates are 3% to 4%. Moreover, the gas station had been vacant for over five years.

---

[5]The trial court found, when the owners of International Plaza appealed the 2001 tax assessment of International Plaza, that they represented to the assessor that the vacancy rates for the shopping center were 39% in 2001, 33% in 2000, and 29% in 1999.

Enright testified that the redevelopment project area suffered from excessive vacancies. He based his opinion on site observations, the Village's annual survey of all shopping centers, and the January 2001 and November 2001 appraisals.

McKenna, using the five-year histories for Arlin-Golf Plaza and International Plaza, testified that there were excessive vacancies in the redevelopment project area. He also testified that the gas station had been vacant for more than five years.

Rychlicki testified that the redevelopment project area suffered from excessive vacancies. He based his opinion on site observations, his review of the Village's surveys that related to vacancies over the last five years, and property information from the assessor's office. Also, as noted above, Rychlicki testified that the rental rates were less than the rental rates of surrounding areas. The trial court found that the reduced rental rates suggested that many of the tenants that did rent space at International Plaza did so because of the reduced rates.

In its brief, Capital Fitness disputes the above vacancy calculations and instead argues that it had a vacancy rate of 2.2% in April 2002 and 8% in 2001. The trial court found that the higher occupancy rate "does not prove the vitality of the shopping center, but may be because the management of International Plaza went to great lengths, in the form of rent abatements and discounts, to decrease the vacancies on the eve of the approval of the TIF ordinances." It is clear that the trial court was aware of the dispute regarding the vacancy rates at International Plaza and found, based on the vacancy rates in the TIF report and the testimony from the witnesses, that there were excessive vacancies. We note that the disputed figures did not include the undisputed vacancy rates at Arlin-Golf Plaza.

We find, based upon the above evidence presented at the trial, that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it found that the improved areas of the redevelopment project area suffered from excessive vacancies. Accordingly, the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

### D. Inadequate Utilities

The Village also found that the blighting factor of inadequate utilities existed. See 65 ILCS 5/11—74.4—3(a)(1)(H) (West 2002) (defining "inadequate utilities" as "[u]nderground and overhead utilities such as storm sewers and storm drainage, sanitary sewers, water lines, and gas, telephone and electrical services that are shown to be inad-

equate"). The trial court found that the Village abused its discretion when it found that the improved areas of the redevelopment project area suffered from inadequate utilities because the complained-of streets, curbs, gutters, sidewalks and streetlights, were not "utilities" as defined by the TIF Act. The Village did not file a notice of appeal contesting the trial court's order containing this finding, therefore, we cannot review this issue on appeal. See 155 Ill. 2d R. 301 (Rule 301 provides that the appeal is initiated by filing a notice of appeal).

### E. Deleterious Land Use or Layout

The TIF Act defines "deleterious land use or layout" as "[t]he existence of incompatible land-use relationships, buildings occupied by inappropriate mixed-uses, or uses considered to be noxious, offensive, or unsuitable for the surrounding area." 65 ILCS 5/11—74.4—3(a)(1)(J) (West 2002). In the instant case, the following evidence was established at trial. The TIF study indicated that 90% of the parcels in the redevelopment project area exhibited incompatible land-use relationships or layout. Moreover, as indicated above, the shopping center's U-shape layout contributed to vacancies. In addition, the single-family residences surrounded by commercial buildings had minimal buffering from the commercial properties, and the commercial properties between Golf Terrace and Gold Road occupied irregular lots within limited access and loading space.

Enright testified that the redevelopment project area developed in a hodgepodge incremental manner over a period of years. He also testified that there was no connection between the various properties and that the area's layout was not based upon contemporary standards: there was no visibility from major roadways and there were no interconnected parking lots shared by major anchor tenants.

McKenna testified that International Plaza was originally built in a U-shaped configuration that lent itself to having an anchor tenant. However, the shopping center no longer has an anchor tenant.

Rychlicki testified that the redevelopment project area suffered from deleterious land use or layout. In making that determination, he looked at the various types of uses present within the area (such as commercial or residential), the dimensions of the land, and the buffering between the uses. He noted that, in the instant case, residential structures were primarily located along Golf Terrace.

In its brief, Capital Fitness acknowledges that the gas station, the Arlin-Golf Plaza, and the residences on Golf Terrace "might fall within the definition of deleterious land use or layout."

We find, based upon the evidence presented during the trial, that Capital Fitness failed to establish by clear and convincing evidence

that the Village abused its discretion in finding that the improved areas of the redevelopment project area suffered from deleterious land use or layout. Accordingly, we hold that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

### F. Lack of Community Planning

The TIF Act defines "[l]ack of community planning" as: "[t]he proposed redevelopment project area was developed prior to or without the benefit or guidance of a community plan." 65 ILCS 5/11—74.4—3(a)(1)(L) (West 2002). It must be determined whether "the development occurred prior to the adoption by the municipality of a comprehensive or other community plan or that the plan was not followed at the time of the area's development." 65 ILCS 5/11—74.4—3(a)(1)(L) (West 2002). In order to establish a lack of community planning, there must be evidence of "adverse or incompatible land-use relationships, inadequate street layout, improper subdivision, parcels of inadequate shape and size to meet contemporary development standards, or other evidence demonstrating an absence of effective community planning." 65 ILCS 5/11—74.4—3(a)(1)(L) (West 2002).

The TIF report introduced at the trial indicated that the redevelopment project area suffered from a lack of community planning. Specifically, the area was developed in stages as indicated by the single-family homes surrounded by commercial properties, minimal coordination of parking, and access/egress arrangements. As a result, there have been poorly designed retail areas leading to high vacancy rates, parcels of inadequate shapes and sizes for contemporary redevelopment, obsolete platting of land parcels with limited access and visibility, and a lack of cross-access easements and shared parking arrangements.

McKenna testified that the redevelopment project area suffered from a lack of community planning. Part of the area was built before it was annexed into the Village, and the Village staff indicated that the area would not currently be allowed to develop under existing planning and zoning standards.

Rychlicki also testified that the redevelopment project area suffered from a lack of community planning. He was able to determine how the buildings had developed over time by looking at the development patterns and uses for the buildings in the area. For example, the residential buildings along Golf Terrace were built 40 years before the redevelopment plan, the buildings along Council Trail were built 30 years before the redevelopment plan, some of the commercial

structures were developed 20 years before the redevelopment plan, and International Plaza was developed in 1987. Rychlicki testified that the area was developed in a piecemeal fashion, which resulted in incompatible uses.

We find, based upon the evidence presented during the trial, that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it found that the improved areas of the redevelopment project area suffered from a lack of community planning. Accordingly, we hold that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

### G. Lag in Equalized Assessed Value

The TIF Act explains that a lag in the equalized assessed value of the proposed redevelopment project area occurs when (1) the total equalized assessed value of the proposed redevelopment project area of the proposed redevelopment project area has declined for three of the last five years, (2) the total equalized assessed value of the proposed redevelopment project area is increasing at an annual rate that is less than the balance of the municipality for three of the last five years, or (3) the total equalized assessed value of the proposed redevelopment project area is increasing at an annual rate that is less than the "Consumer Price Index for All Urban Consumers" published by the United States Department of Labor for three of the last five years. 65 ILCS 5/11—74.4—3(a)(1)(M) (West 2002).

The TIF report introduced at the trial indicated that the equalized assessed value of the proposed redevelopment project area of the redevelopment project area had declined for three of the last five calendar years. McKenna testified that, in order to determine that the equalized assessed value of the proposed redevelopment project area had declined for three of the last five years, they retrieved the relevant records from the Cook County clerk's office and compared the percentage change over a five-year period of time between the consumer price index and the equalized assessed value of the proposed redevelopment project area of the Village as a whole. Rychlicki's and Enright's testimony was similar to McKenna's testimony. Two of Capital Fitness's witnesses, Hovany and Yaksavich, conceded that the equalized assessed value of the proposed redevelopment project area had declined for three of the last five calendar years.

Capital Fitness concedes in its brief that "the TIF Area, as a whole, appears to comply with this blighting factor because for [three] out of the [five] preceding years before TIF No. 4 was adopted lag behind the

[consumer price index] for both the improved and vacant parcels."
However, Capital Fitness argues that the standards are subordinate to
the statutory requirement that such lag in the equalized assessed
value of the proposed redevelopment project area must be found to ex-
ist to a meaningful extent and be reasonably distributed throughout
the TIF Area. However, the trial court noted that the plain language
of the TIF Act requires that the Village consider the "total" equalized
assessed value of the proposed redevelopment project area. 65 ILCS
5/11—74.4—3(a)(1)(M) (West 2002). Therefore, the trial court properly
determined that the TIF Act required an analysis of whether the
equalized assessed value of the proposed redevelopment project area of
the project area as a whole lagged behind the equalized assessed value
of the proposed redevelopment project area for the rest of the village.
See 65 ILCS 5/11—74.4—3(a)(2)(F) (West 2002).

We find, based upon the evidence presented during the trial, that
Capital Fitness failed to establish by clear and convincing evidence
that the Village abused its discretion when it found that the improved
areas of the redevelopment project area suffered from a lag of the
equalized assessed value of the proposed redevelopment project area.
*Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit
School District No. 255-U*, 253 Ill. App. 3d at 508. Accordingly, because
six of the blighting factors existed for the improved area of the
redevelopment project area, we hold that the trial court's order find-
ing that the improved area of the redevelopment project area was
blighted is not against the manifest weight of the evidence. *Geisler*,
383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School
District No. 255-U*, 253 Ill. App. 3d at 508.

### IV. Blighting Factors Relevant to the Vacant Area

As indicated above, in order for vacant land to be considered
blighted, the sound growth of the redevelopment project area must be
impaired by a combination of two or more of the following blighting
factors: (1) obsolete platting, (2) diversity of ownership of parcels, (3)
tax and special assessment delinquencies, (4) deterioration, (5) hazard-
ous waste cleanup, and (6) lag in the equalized assessed value of the
proposed redevelopment project area. 65 ILCS 5/11—74.4—3(a)(2)
(West 2002). The Village found that the following blighting factors
existed in the vacant land located in the redevelopment project area:
(1) obsolete platting, and (2) lag in the equalized assessed value of the
proposed redevelopment project area. The trial court found that the
five parcels of vacant property shared a common owner and that there
was no indication that the common carrier would have difficulty
developing them together. Finally, the trial court found that the Vil-

lage abused its discretion when it concluded that the vacant lots suffered from obsolete platting.

Nevertheless, a vacant land may also be considered blighted if any one of the following blighting factors exists: (1) the area consists of one or more unused quarries, mines, or strip mine pods; (2) the area consists of unused rail yards, rail tracks, or railroad rights-of-way; (3) the area is subject to chronic flooding "that adversely impacts on real property in the area as certified by a registered professional engineer or appropriate regulatory agency"; (4) the area consists of unused or illegal disposal sites; (5) the land is designated as a town or village center; or (6) the area qualified as a blighted improved area immediately prior to becoming vacant. 65 ILCS 5/11—74.4—3(a)(3) (West 2002). In the instant case, the Village found that the area was subject to chronic flooding. 65 ILCS 5/11—74.4—3(a)(3)(C) (West 2002). The trial court found that the Village did not abuse its discretion in finding that the vacant lots[6] in the redevelopment project area were subject to chronic flooding.

The following evidence was presented during the trial regarding the chronic flooding of the redevelopment project area. The TIF study indicated that the area along Council Trail suffered from flooding. One of the exhibits admitted in evidence during the trial was the March 11, 2002, memo from Mark Schoeffmann, the Village's former director of engineering and a certified engineer. Schoeffmann stated in the memo that he had observed the property on many occasions and had witnessed the chronic flooding of the location. He further stated in the memo that the property did not drain naturally and that significant infrastructure investments would have to be made to provide storm water drainage and eliminate the flooding condition.

McKenna testified at trial that there was severe chronic flooding in the vacant lots. Blackwood testified that the lot was often covered in water. Farwell also testified that there was significant flooding. Similarly, Enright testified that the area suffered from chronic flooding and that, if there was any rain, the parking lots would flood and pond for an extended period of time. Enright also testified that although one of Capital Fitness's witnesses opined that it would cost $30,000 to fix the flooding problem, the $30,000 it would cost to extend the sewer line was not the only cost associated with the flooding conditions. There would also have to be roadway improvements and extensive improvements to the vacant parcels.

---

[6]In its brief, Capital Fitness contends that lots 8, 14, and 15 should have all been considered vacant lots, but the trial court only considered lot 15. The trial court noted that lot 15 was the largest of the vacant lots (*i.e.*, there was more than one vacant lot) in the redevelopment project area.

Massarelli testified that he installed a water main down Council Trail prior to 2002 and that there were no storm sewers within the roadway for Council Trail. He opined that the vacant lots were subject to flooding, that he has seen flooding on the lots before, and that at least 25% to 30% of the lot floods.

We find, based upon the evidence presented during the trial, that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it found that the vacant areas of the redevelopment project area suffered from chronic flooding. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508. Accordingly, because this stand-alone blighting factor was present in the vacant area, we hold that the trial court's order finding that the vacant area of the redevelopment project area was blighted is not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

## V. The "But For" Test

The TIF Act provides that no redevelopment plan shall be adopted unless a municipality finds that the redevelopment project area has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan. 65 ILCS 5/11—74.4—3(n)(J)(1) (West 2002). This is, as previously pointed out, commonly referred to as the "but for" test. See, *e.g.*, *Board of Education, Pleasantdale School District No. 107*, 341 Ill. App. 3d at 1019.

In its brief, Capital Fitness maintains that the Village failed to comply with the "but for" test. Specifically, Capital Fitness contends that evidence was presented that there was significant investment inside and outside of the redevelopment project area.

The redevelopment plan indicated that the redevelopment project area represented a "significant potential for development" and that the Village had identified a number of goals and objectives for business development. The Village had reviewed the redevelopment project area "for possible development for a period of time" and had conducted a study of possible land-use plans for the area. There were a number of uses within the redevelopment project area, and it would be difficult to develop the area in a coordinated manner. The redevelopment plan also explained the methodology used when evaluating the redevelopment project area's potential qualification as a TIF district. Such methodology included site surveys, exterior evaluation of structures and associated site improvements, tax information, tax

maps, aerial photos, site data, discussions with Village officials and staff, and an evaluation of area-wide factors that have affected the area's development. The redevelopment plan also concluded that the "area has not benefitted from coordinated planning efforts by either the public or private sectors." Accordingly, the redevelopment plan concluded that, without public funds, the redevelopment project area may continue to be underutilized.

The Village held a public hearing on whether the Village should find the redevelopment project area blighted for purposes of the TIF Act. After the hearing, the Village adopted ordinance No. 02—049, which provided that the corporate authorities had reviewed the conditions pertaining to real property in the proposed redevelopment project area to determine whether the parcels of real property and the improvements thereon would be substantially benefitted by the proposed improvements. Ordinance No. 02—049 also provided that the corporate authorities had reviewed the conditions pertaining to a lack of private investment in the proposed area to determine whether private development would take place in the area without adoption of the proposed redevelopment plan. Accordingly, in ordinance No. 02—049, the Village found that the corporate authorities had found that the "proposed Area on the whole has not been subject to growth and development through investment by private enterprise and would not be reasonably anticipated to be developed without the adoption of the Plan."[7] Village of Arlington Heights Ordinance No. 02—049 (eff. July 1, 2002).

McKenna testified that but for the intervention of the Village, it was not likely that the area as a whole would redevelop on its own. McKenna relied on the 2001 appraisals that indicated that the property had deteriorated, that there had been vacancies around 25% to 26%, and that there had been a 45% decline in the equalized assessed value of the proposed redevelopment project area between 1994 and 2000. McKenna noted that there was other property that had developed in the area, but the subject property remained fundamentally stagnant. McKenna also opined that there were no other special service areas or special assessments that would have been available or were appropriate.

Rychlicki also testified that but for the intervention of the Village, the area would not have been able to redevelop. Rychlicki noted that

---

[7]In its brief, Capital Fitness contends that the redevelopment plan adds additional language to the "but for" test. Our examination of ordinance No. 02—049, which contained the Village's findings relating to the redevelopment project area, revealed that it utilized the proper language.

the area suffered from multiple ownership and buildings that were obsolete or in disrepair. He opined that the location would be difficult to redevelop with large retailers.

Enright testified that but for the intervention of the Village, the area would not have been able to redevelop. He testified that there had been no significant development in the area for 17 years. He further testified that, although there had been discussions about an Aldi grocery store and about Walgreen and Jewel renovations, the projects were "very small" and did not "have the impediments that you have here in this project area, which of course are the seven factors to be improved, and then the vacant areas, as well." Moreover, Enright testified that Walgreen moved across the street (*i.e.*, out of the redevelopment project area) because the "economics" in the redevelopment project area were not viable.

We find, based upon the evidence presented during the trial, that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it concluded that the redevelopment project area was not subject to growth and development through private enterprise and that the area would not reasonably be anticipated to be developed without the adoption of the redevelopment plan. Accordingly, we hold that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

In its brief, Capital Fitness contends that there was investment within the redevelopment project area. Capital Fitness also pointed out that a restaurant was under construction, that Foster Bank had entered into a lease to occupy a space at International Plaza (although Foster Bank never moved into the space), and Capital Fitness and other tenants had invested money for improvements in their respective leased spaces. The trial court found that Capital Fitness did present evidence of "minor developments of storefronts within International Plaza," but the trial court also found that "evidence of these improvements alone does not constitute clear and convincing evidence that would rebut the Village's presumptively valid conclusion that the project area as a whole was not subject to redevelopment." We hold, taking into consideration the evidence presented in the redevelopment plan, the applicable ordinances, and the testimony of Enright, McKenna, and Rychlicki, that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

In its brief, Capital Fitness also contends that there was investment outside of the redevelopment project area. Capital Fitness points out the following developments outside of the redevelopment project area: four luxury homes were constructed; an Aldi and Walgreen were being constructed; Jewel-Osco was being renovated; and a Wal-Mart, Sam's Club, and Meijer were being developed one mile outside the redevelopment project area. Capital Fitness also pointed out various residential and commercial developments in the area adjacent to the redevelopment project area. Capital Fitness notes, however, in its brief that sales tax rebate assistance was provided by the City of Rolling Meadows for the Wal-Mart, Sam's Club, and Meijer projects. In addition, Enright testified that the Aldi, Walgreen, and Jewel renovations were "very small" projects that did not have the same impediments that were present in the redevelopment project area. We hold, taking into consideration the evidence presented in the redevelopment plan, the applicable ordinances, and the testimony of Enright, McKenna, and Rychlicki, that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

### VI. Conformance With the Comprehensive Plan

The TIF Act provides that no redevelopment plan shall be adopted unless a municipality finds that the redevelopment plan and project conform to the comprehensive plan for the development of the municipality as a whole. 65 ILCS 5/11—74.4—3(n)(J)(2) (West 2002). In the instant case, it is undisputed that the land-use map in the redevelopment plan indicates that particular lots are designated for residential use, while the land-use map in the 1997 comprehensive plan indicated that the lots were for commercial use. The trial court found that the redevelopment project area conformed to the comprehensive plan "aside from residential lots located along Council Trail that are currently zoned commercial." However, the trial court also found that this "minor defect" was insufficient to invalidate the TIF ordinances.

Enright testified at trial that the redevelopment plan conformed with the comprehensive plan. Enright also testified that the 1977, 1984, and 1988 comprehensive plans listed four parcels within the redevelopment project area as residential. However, in 1997, when the map was transferred to the computer, the firm that constructed the map indicated that the parcels were for commercial use.

In *City of Batavia v. Sandberg*, the City adopted an ordinance condemning a commercial building owned by Sandberg and filed a

complaint for condemnation pursuant to the TIF Act. *City of Batavia v. Sandberg*, 286 Ill. App. 3d 991, 994 (1997); 65 ILCS 5/11—74.4—4 (West 1992). Sandberg argued that the ordinance was invalid because it did not comply with section 11—74.4—3(n)(2) of the Act, which required that the redevelopment plan and project conform to the comprehensive plan. *City of Batavia*, 286 Ill. App. 3d at 998; 65 ILCS 5/11—74.4—3(n)(2) (West 1992). Sandberg noted that the ordinance incorporated a report which stated that the redevelopment plan was consistent with the comprehensive plan with "some minor exceptions." *City of Batavia*, 286 Ill. App. 3d at 999. Sandberg argued that the "minor exceptions" demonstrated that the redevelopment plan was not in strict conformity with the comprehensive plan. *City of Batavia*, 286 Ill. App. 3d at 999. The appellate court found that the fact that the report indicated that there were some minor discrepancies did not undermine the City's finding that the redevelopment plan and project conformed to the comprehensive plan as a whole. *City of Batavia*, 286 Ill. App. 3d at 999.

In the instant case, as noted above, it is undisputed that the land-use map in the redevelopment plan does not mirror that of the land-use map in the 1997 comprehensive plan. However, in ordinance No. 02—49, the Village stated that the corporate authorities had reviewed the proposed project and plan and the existing comprehensive plan for development of the municipality as a whole to determine whether the proposed redevelopment project area and plan conformed to the comprehensive plan of the municipality. The Village found that the "Project and Plan conform[ed] to the comprehensive plan for the development of the Municipality as a whole." Village of Arlington Heights Ordinance No. 02—049 (eff. July 1, 2002). Therefore, as in *City of Batavia*, we find that the discrepancy between the land-use maps in the redevelopment plan and the comprehensive plan in the instant case does not undermine the Village's finding that the redevelopment project area and plan conformed to the comprehensive plan as a whole. We further find that ordinance No. 02—049 also indicated that, following a public hearing, the Village took into consideration the recommendation of the redevelopment commission, the factors which caused the area to be blighted, other studies relating to the conditions in the proposed redevelopment project area, the conditions of the real property and whether contiguous parcels of real property improvements would be substantially benefitted by the proposed project, and the fact that the proposed area had not been subject to growth and development through investment by private enterprise and would not be reasonably anticipated to be developed without the adoption of the redevelopment plan. Therefore, like the

appellate court in *City of Batavia*, we hold that the discrepancies in the land-use maps do not invalidate ordinance No. 02—049. *City of Batavia*, 286 Ill. App. 3d at 999.

In light of the preceding, we find that Capital Fitness failed to establish by clear and convincing evidence that the Village abused its discretion when it concluded that the proposed redevelopment project area conformed to the comprehensive plan. Accordingly, we hold that the trial court's finding was not against the manifest weight of the evidence. *Geisler*, 383 Ill. App. 3d at 850, citing *Reed-Custer Community Unit School District No. 255-U*, 253 Ill. App. 3d at 508.

## CONCLUSION

For the above reasons, we affirm the trial court's January 26, 2007, order denying Capital Fitness's request for declaratory judgment.

Affirmed.

GALLAGHER and STEELE, JJ., concur.